# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00977-COA

COAHOMA COUNTY, MISSISSIPPI SCHOOL DISTRICT

APPELLANT

v.

ARETHA WILLIAMS

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/18/2024 |
| TRIAL JUDGE: | HON. WATOSA MARSHALL SANDERS |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMIE FERGUSON LEE |
| | KATHERINE MAYO PORTNER |
| | DANIEL JUDSON GRIFFITH |
| ATTORNEY FOR APPELLEE: | SAMUEL L. BEGLEY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 05/26/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A school counselor was terminated after she had a clash with another counselor and made a statement that she needed to obtain a "license to carry." School administrators testified they "had to take action because the safety of an employee was threatened." The school board found that she had neglected her duty and failed to conduct herself in a professional manner when dealing with another staff member.

¶2.     The counselor contested her termination and the chancery court reversed the decision, finding there was not an actual threat. The school board now appeals. Because we find the school board's decision to terminate the counselor was supported by substantial evidence,

we reverse the chancery court's order and render a decision in favor of the school board.

## BACKGROUND FACTS

¶3. Dr. Aretha Williams was employed as a high school counselor with the Coahoma County School District beginning in 2021.

¶4. In the summer of 2022, Dr. Williams was made aware that her employment as a high school counselor would be changing. Dr. Williams was informed that she would be swapping roles with Rodericka Robinson, who had been serving as the middle school counselor. Dr. Williams was unhappy with the change and had several confrontations and arguments with Robinson throughout the following school year.

¶5. Tensions then rose even further during the summer of 2023. This time, Dr. Williams was informed that in addition to her normal responsibilities as the middle school counselor, she would also be in charge of counseling the high school's career and technical education (CTE) students. Dr. Williams was unhappy with this change to her duties and voiced her grievances to her supervisors. Nevertheless, Dr. Williams was assigned the role of middle school and CTE counselor going into the start of the 2023-24 school year.

¶6. A couple of weeks into the school year, Dr. Williams sent an email to the Mississippi Department of Education asking, "Please tell me how the high school counselor vs CTE counselor works." She received an email response from the director of CTE counseling and student services explaining that schools can have a designated CTE counselor, and that "[t]ypically, when a school does not have a designated CTE counselor, the HS counselor will collect the documentation required[.]" In turn, Dr. Williams forwarded this email to the

Coahoma County School District Superintendent and Assistant Superintendent that same day.

¶7.     The next day, Dr. Williams had an encounter with Robinson, the other counselor, in the high school main office.  Written reports and testimony about the details of this exchange conflicted, but there was a general consensus that Dr. Williams remarked she should have forwarded the Department's email to Robinson as well. According to Robinson, Dr. Williams further stated that she should have forwarded the email because CTE was Robinson's job. Robinson would later testify that in response, she told Dr. Williams "I do my job" and that Dr. Williams was "too old to be acting messy." Robinson then reported the confrontation to school officials.

¶8.     As a result, the following morning, Dr. Williams received a "Professional Conduct Violation" letter from the school principal, Tyinika Shaw. Principal Shaw handed this letter directly to Dr. Williams in the school hallway. The letter served as a formal warning to "avoid any conversations and or actions that can be viewed as violating codes of conduct," including "[r]especting fellow educators and participating in the development of a professional teaching environment" and "[h]arassment of colleagues."

¶9.     After receiving the letter, Dr. Williams requested a meeting with the principal and a meeting was scheduled for one o'clock that day. At her meeting, Dr. Williams attempted to excuse her actions by bringing to the principal's attention that there was a rumor going around that Robinson was going to "beat up" Dr. Williams. Principal Shaw would later testify that Dr. Williams "told me about whooping the derriere."

¶10.    At some point that same day, Dr. Williams also typed up two different written

3

responses to the warning letter, one to Principal Shaw and one to the school district Superintendent, Dr. Virginia Young. Dr. Williams' letter to Principal Shaw stated, "I was told she [Robinson] said she was going to be[at] that old lady ***." Then in Dr. Williams' letter addressed to Superintendent Dr. Young, she wrote "it was brought to my attention, Mrs. Robinson pungently avowed around colleagues, 'I'm going to beat that old lady's derriere!'"

¶11.   The incident that ultimately led to Dr. Williams' termination occurred on that same day. Dr. Williams was in the high school main office where she was talking to Assistant Principal McKinley Scott. Dr. Williams told Scott that "she didn't agree with her daughter having a license to carry and that she felt like – at this moment that she felt like she needed to get her license to carry." Dr. Williams made this statement loudly with Robinson nearby.

¶12.   Robinson reported this incident to Principal Shaw. She filed a written complaint relaying that "On August 17, 2023, Ms. Aretha Williams said at first I did not approve of my daughter being licensed to carry, now I see why. I guess I am going to have to be licensed now." Assistant Principal Scott also filed a written report relaying that "On 8/17/23, Dr. Aretha Williams walked up to me and stated that at first she didn't approve of her daughter having a license to carry a gun, but now she understands why. She proceeded to say that I am going to have to be licensed now." A third witness in the office that morning, Dominique Hines, reported: "The morning of 08/17/2023, Ms. Robinson, McKinley Scott, and myself are in the high school office. Dr. Williams walks over and tells Mr. Scott I didn't like that my daughter has a conceal to carry a weapon, but now I approve because it seems that I will

be needing one since I'm old."[1]

¶13. These incidents culminated in the Superintendent immediately dismissing Dr. Williams from her employment. Dr. Williams received a separate dismissal letter from the Superintendent which explained that her termination was due to a "neglect of duty." More specifically, "[f]ailure to present yourself in a professional manner while dealing with another staff member in violation of Standard 1 of the Code of Ethics."

¶14. The letter also informed Dr. Williams that she had the right to appeal the termination through a hearing. Dr. Williams chose to invoke this right and was represented by counsel.

## PROCEDURAL HISTORY

¶15. A hearing officer was appointed and conducted a hearing over three days in September, October, and November of 2023 regarding Dr. Williams' dismissal. A number of witnesses testified, including Dr. Williams.

¶16. The record shows the board was presented with testimony from Assistant Superintendent Gooden who participated in the investigation into Dr. Williams' conduct. Gooden testified that Dr. Williams faced termination:

> [Gooden]: Because there was a threat with the use of a weapon involved. And we have to protect our students but also our employees. And if our employees are threatened, we have to take action. And at that point, not only was Ms. Robinson's safety threatened, everybody at the school -- school's safety was threatened because Dr. Williams made mention of a gun.
> . . . .
> [Attorney]: What position did this put you in as the deputy superintendent?

---

[1] Mildred Michael, another school employee, later submitted a statement in which she recounted that "Dr. Williams was reported to say that she feels threaten[ed] because she did not want anyone to feel as if they could approach her to fight."

5

| [Gooden]: | **We had to take action because the safety of an employee was threatened**. |
|---|---|
| [Attorney]: | Why do you feel the safety was threatened? |
| [Gooden]: | Because of the statement that Dr. Williams made about being licensed to carry. |
| | . . . . |
| | Because of the hostility that she had towards Ms. Robinson . . . We were afraid for Ms. Robinson's safety because of that comment. |
| | . . . . |
| [Attorney]: | When the statement was made about carrying a concealed weapon or gun, where was that statement made? |
| [Gooden]: | In the high school front office. |
| | . . . . |
| | [W]hen concealed carry became law, . . . all of our buildings received a sign that said our employees -- you're not allowed to carry weapons on our premises . . . |

(Emphasis added).

¶17. The Superintendent provided the following testimony at the hearings explaining her decision to dismiss Dr. Williams:

| [Attorney]: | You recommended termination of Dr. Williams? |
|---|---|
| [Dr. Young]: | Yes. . . . the remark was made about a gun and concealed carry. . . . because that comment did disturb me. . . . But, based on her statement, it was my determination that she did not need to be in the district. |
| | . . . . |
| [Attorney]: | . . . did anyone ever say that Dr. Williams said the word "gun"? |
| [Dr. Young]: | Yes. . . . More than one individual said it. . . . Mr. McKinley Scott said it. Ms. Gooden said it to me when -- when it was brought to her attention. |
| [Attorney]: | And was it the mentioning of the word "gun"? Was that the reason you found this statement to be so severe? |
| [Dr. Young]: | Yes, sir. |
| | . . . . |
| | **It is dangerous because she works in a school, and she is talking about guns in school. That's a red flag for me, anyone speaking of a gun.** |
| | . . . . |

6

| [Attorney]: | What was your mind-set, as the superintendent of education, after this statement? |
|---|---|
| [Dr. Young]: | I was fearful because of how Ms. Robinson felt . . . I did not want -- **I did not want it to be an incident here where Dr. Williams brought a gun and shot Ms. Robinson. I was not going to take that chance**. |

(Emphasis added). In the end, Dr. Young explained that Dr. Williams' concerns over the change in her job duties was "not the reason she was terminated." Instead, the reason for her termination was "Neglect of duty, failure to present [her]self in a professional manner while dealing with another staff member in violation of Standard 1 of the Code of Ethics."

¶18.  Notably, Dr. Williams admitted to making the statement about a license to carry at least 3 different times throughout the hearings:

> 'Mr. Scott, you know I wasn't keen on my baby being licensed to carry.' I said, 'But I guess I need protection.'
> . . . .
> [Y]ou know, I really didn't want my baby to be licensed to carry, and I said I didn't want that for my child, but I do understand but some -- I said I guess I don't need help.
> . . . .
> 'Mr. Scott, no, I do not approve of my daughter being licensed to carry, but I do understand and I need -- because I might need some protection.'

Dr. Williams further testified:

| [Attorney]: | And the reason you -- why did you state that to Principal Scott? What made you state that? |
|---|---|
| [Williams]: | What made me state it was I wasn't for sure what had transpired. And I needed people to understand I don't carry, but I'm glad my daughter does because she might have to support her momma. |
| | . . . . |
| | But when I made the statement to Mr. Scott, it was to Mr. Scott because I had already heard things being said. |
| | . . . . |
| | I was concerned. I mean, my thing about it was -- I can't |

7

> imagine that taking place, no. But my thing about it is I can't believe all of the other stuff that has been said. But I just wanted them to understand that, no, I'm not carrying, but I am glad my child does.
>
> [Attorney]: Okay. And was your comment just a comment about self-defense?
>
> [Williams]: Actually, yes.

¶19. Robinson, the other counselor, also provided testimony at the hearing. She advised that when the statement was made about a license to carry: "And as far as Dr. Williams, and it was also -- it was a student in there. A student was in there as well."

¶20. After the hearing was complete, the hearing officer presented the School Board with the hearing transcripts, exhibits, and an 18-page objective summary of the evidence presented. Upon reviewing the materials from the hearing, the school board voted unanimously to uphold Dr. Williams' termination and issued a written decision.

¶21. Aggrieved, Dr. Williams sought review of the decision by the Coahoma County Chancery Court. Dr. Williams raised four issues to the chancery court: whether she "was afforded procedural due process;" whether "unethical conduct" constitutes a sufficient reason for termination; and "[w]hether there was substantial evidence in the record of the termination hearing to support Dr. Williams' dismissal based on 'neglect of duty,'" and "for verbal harassment of a colleague under the Mississippi Educator Code of Ethics."

¶22. The chancery court held a hearing on Dr. Williams' appeal in May 2024 and subsequently entered its order in July 2024. The chancery court issued an opinion overturning the Coahoma County School Board's decision and reinstating Dr. Williams to her position of 7th and 8th grade counselor and CTE counselor.

¶23. The chancery court's order held:

> Nor does this [c]ourt find that Dr. Williams harassed Ms. Robinson by telling Assistant Principal Scott that she needed to get a license to carry a concealed weapon. Without some clear direct threatening language directed at Ms. Robinson from Dr. Williams, this [c]ourt does not find that Dr. Williams comment was threatening or constituted harassment. Neither does this [c]ourt find that Dr. Williams comments about the license to carry a concealed weapon constitutes inappropriate language on school grounds.
> . . . .
> It appears the school district relied on Ms. Robinson's feelings of harassment to determine that Dr. Williams exhibited harassing and threatening behavior towards Ms. Robinson instead of the multiple witnesses who did not see Dr. Williams threaten or harass Ms. Robinson. Instead, the witnesses saw them engaging in a quiet conversation that Ms. Robinson walked away from badmouthing Dr. Williams. Likewise, the school district relied on Ms. Robinson's word that Dr. Williams made the 'license to carry a concealed weapon' comment in a threatening way, instead of an off-hand comment made by Dr. Williams to Assistant Principal Scott, and not Ms. Robinson.

¶24. The chancellor "[found] that the school acted arbitrarily and capriciously when they relied on Ms. Robinson's word to characterize Dr. Williams actions and statements as harassing and threatening instead of the substantial evidence." And "[b]ased on the school district's reliance on Ms. Robinson's word as opposed to actual evidence, this [c]ourt finds that the decision to terminate Dr. Williams was both arbitrary and capricious."

¶25. The school district now appeals the chancery court's decision.

**STANDARD OF REVIEW**

¶26. "Judicial review of an administrative decision is limited." *Langley v. Miss. State Bd. of Educ.*, 379 So. 3d 352, 363 (¶41) (Miss. Ct. App. 2023) (quoting *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 151 (¶20) (Miss. 1999)). For an "appeal of the decision of an administrative agency, all levels of review focus on the final decision of the

9

agency." *Id*. (quoting *Miss. State Bd. of Contractors v. Hobbs Constr. LLC*, 291 So. 3d 762, 768 (¶12) (Miss. 2020)).

¶27. "A rebuttable presumption exists in favor of the administrative agency, and the challenging party has the burden of proving otherwise." *Rivers v. Bd. of Trs., FCAHS*, 876 So. 2d 1043, 1046 (¶12) (Miss. Ct. App. 2004). Importantly, "the administrative agency sits as finder of fact," and as such, the "reviewing court is obligated to show 'substantial deference' to any determination of credibility or trustworthiness of witness testimony." *Langley*, 379 So. 3d at 363 (¶41) (quoting *Buckhaults v. Pub. Emps.' Ret. Sys. of Miss.*, 296 So. 3d 727, 731 (¶9) (Miss. Ct. App. 2019)). Therefore, an appellate "[c]ourt must not reweigh the facts of the case or insert its judgment for that of the agency." *Rivers*, 876 So. 2d at 1046 (¶12).

## DISCUSSION

¶28. The School District seeks to have Dr. Williams' termination reinstated. It presents three core arguments insisting the chancery court improperly reversed the Board's termination. First, that Dr. Williams' neglect of duty was a terminable violation. Second, that substantial evidence supports the board's decision to terminate Dr. Williams. Third, the decision to terminate Dr. Williams was not arbitrary and capricious.

¶29. In Mississippi, "[t]he superintendent of a school district may terminate the employment of a principal or teacher for good cause at any time." *Jackson Pub. Sch. Dist. v. Mason*, 295 So. 3d 484, 489 (¶13) (Miss. Ct. App. 2019) (citing Miss. Code Ann. § 37-9-59 (Supp. 2018)). "Dismissal of certificated school employees is governed by Miss

Code Ann. § 37-9-59 . . . which provides good cause reasons for dismissal." *Harris v. Canton Separate Pub. Sch. Bd. of Educ.*, 655 So. 2d 898, 901 (Miss. 1995).

¶30. Pursuant to statute, "For incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the superintendent of schools may dismiss or suspend any licensed employee in any school district." Miss. Code Ann. § 37-9-59 (Rev. 2019). "In the event the continued presence of said employee on school premises poses a potential threat or danger to the health, safety or general welfare of the students, . . . the superintendent may immediately release said employee of all duties pending a hearing[.]" Miss. Code Ann. § 37-9-59 (Rev. 2019).

¶31. "The school board is the administrative agency charged by statute with making the ultimate employment decision in all teacher dismissal and nonrenewal cases." *S. Panola Sch. Dist. v. Rone*, 315 So. 3d 1046, 1052 (¶13) (Miss. Ct. App. 2020) (quoting *Noxubee Cnty. Bd. of Educ. v. Givens*, 481 So. 2d 816, 819 (Miss. 1985)).

¶32. This Court "must affirm the Board's decision unless it 'is unlawful for the reason that it was: (a) Not supported by any substantial evidence; (b) Arbitrary or capricious; or (c) In violation of some statutory or constitutional right of the employee.'" *Leland Sch. Dist. v. Brown*, 342 So. 3d 508, 516 (¶20) (Miss. Ct. App. 2022) (quoting Miss. Code Ann. § 37-9-113(3) (Rev. 2019)).

## I. The school board's termination decision was supported by substantial evidence and was not arbitrary and capricious.

¶33. The school district argues there were "substantial facts" presented "that Dr. Williams . . . ma[de] an indirect threat to Ms. Robinson regarding obtaining a concealed carry permit

11

to carry a weapon — while Dr. Williams was at school and in the office no less, with no legitimate purpose[.]" According to the district, "there was substantial evidence in the record to afford the inference that Dr. Williams made a thinly veiled threat to Ms. Robinson," and that "[t]hreatening a fellow educator, directly or indirectly, certainly falls within the category of 'failing to present yourself in a professional manner,' 'failure to respect a fellow educator,' and 'failing to participate in the development of a professional teaching environment.'"

¶34. Prior to termination, the school board was presented with evidence from school administrators that they "had to take action because the safety of an employee was threatened;" "you're not allowed to carry weapons on our premises;" it was "dangerous because she works in a school, and she is talking about guns in school;" and they "did not want it to be an incident here where Dr. Williams brought a gun and shot Ms. Robinson" and were "not going to take that chance."

¶35. Dr. Williams' termination came one day after making a comment regarding a need to get a license to carry a gun in the presence of a co-worker, along with other staff members and a student. Multiple eyewitnesses to the statement testified that they heard the comment, even Dr. Williams herself admitted saying it.

¶36. Given these facts, the Coahoma County School Board found "that Dr. Williams failed to present [her]self in a professional manner while dealing with another staff member in violation of Standard 1 of the Code of Ethics."

¶37. "Where the record supports one valid and viable reason to dismiss a teacher, that fact cannot be sidestepped, and the board's decision will not be disturbed." *Hester v. Lowndes*

12

*Cnty. Sch. Dist.*, 137 So. 3d 325, 329 (¶14) (Miss. Ct. App. 2013) (quoting *Spradlin v. Bd. of Trs. of Pascagoula Mun. Separate Sch. Dist.*, 515 So. 2d 893, 899 (Miss. 1987)).

¶38. Furthermore, our Supreme Court "has previously held that there is a duty to provide a safe school environment[.]" *J.S. ex rel. Segroves v. Ocean Springs Sch. Dist.*, 414 So. 3d 47, 57 (¶27) (Miss. 2025) (quoting *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 777 (¶17) (Miss. 2016)). "[A] school district performs its duty to provide a safe school environment by using ordinary care and *curtailing foreseeable risks* to its students." *Id.* (emphasis added).

¶39. One of the paramount duties of educators is to safeguard their charges from harm. In today's environment, raising the specter of armed violence while on school grounds can certainly qualify as an inappropriate and unprofessional statement—especially when the mention of a weapon is made in the presence of a child.

¶40. After reviewing the record as it was presented to the school board, it is clear to this Court that the board's decision to terminate Dr. Williams was supported by substantial evidence. Therefore, we reverse the decision of the chancery court and render an order reinstating the Coahoma County School Board's decision terminating Dr. Williams from her employment.

## II. The chancery court exceeded the standard of review.

¶41. Furthermore, we find that the chancery court went beyond the scope of its standard of review by overturning the school board's decision to terminate Dr. Williams in the face of conflicting evidence.

¶42. Crucially, in school employee termination cases, "the Board is the finder of fact, *not the chancellor*." *Gordon v. Lafayette Cnty. Sch. Dist.*, 923 So. 2d 260, 263 (¶10) (Miss. Ct. App. 2006) (emphasis added). "The chancellor[] . . . does not sit as the trier of fact but as a court of review, much like this Court." *Id.* Put simply, "[t]he reviewing court is by no means entitled to decide the case as if it had been the trier of fact of the issues in dispute." *Amite Cnty. Sch. Dist. v. Floyd*, 935 So. 2d 1034, 1042 (¶19) (Miss. Ct. App. 2005).

¶43. Furthermore, because "the Board was in a position, as neither the [c]hancellor nor this Court can be, to evaluate the demeanor of the witnesses at the hearing," we "accord great weight and deference to school administrators when their discharge of responsibilities is challenged." *Harris*, 655 So. 2d at 902. "Where there is conflicting testimony presented to the school board at a termination hearing, the school board alone, not the reviewing court, is authorized to determine the credibility of the evidence and witnesses before it." *Amite Cnty. Sch. Dist.*, 935 So. 2d at 1042 (¶19).

¶44. While not its role in this type of administrative matter, we find that the chancery court acted as the fact-finder. The chancery court's order expressly reweighs evidence which was properly the role of the school board. For instance: "[w]ithout some clear direct threatening language directed at Ms. Robinson from Dr. Williams, this [c]ourt does not find that Dr. Williams comment was threatening or constituted harassment." And, "[n]either does this [c]ourt find that Dr. Williams' comments about the license to carry a concealed weapon constitutes inappropriate language on school grounds."

¶45. The chancellor also determined that "the school district relied on Ms. Robinson's

14

word that Dr. Williams made the 'license to carry a concealed weapon' comment in a threatening way, instead of an off-hand comment made by Dr. Williams to Assistant Principal Scott, and not Ms. Robinson." Furthermore, the chancellor's order stated that "[b]ased on the school district's reliance on Ms. Robinson's word as opposed to actual evidence, this [c]ourt finds that the decision to terminate Dr. Williams was both arbitrary and capricious."

¶46. Accordingly, we must reverse the ruling of the chancery court in Dr. Williams' case.

**III. Dr. Williams received due process.**

¶47. In her appellee's brief, Dr. Williams challenges whether she received sufficient procedural due process. Specifically, she asserts that the dismissal letter she received did not provide her with enough notice regarding the charges she faced before the Board.

¶48. Dr. Williams did not file a cross-appeal on either of these issues. The school district argues that her failure to file a cross-appeal acts as a procedural bar. Generally speaking, "in order for the appellee to gain reversal of any part of the decision of a lower tribunal about which the appellant brings no complaint, the appellee is required to file a cross appeal." *Nixon v. Howard Indus. Inc.*, 249 So. 3d 1088, 1092 (¶20) (Miss. Ct. App. 2018) (quoting *Brock v. Hankins Lumber Co.*, 786 So. 2d 1064, 1068 (¶¶18-19) (Miss. Ct. App. 2000)). As held by our Supreme Court, "an appellee must file a cross-appeal when he 'seeks to alter or reverse the judgment below.'" *Brown v. Yates*, 68 So. 3d 758, 763 (¶22) (Miss. Ct. App. 2011) (quoting *Dunn v. Dunn*, 853 So. 2d 1150, 1152 (¶8) (Miss. 2003)).

¶49. However, there is a narrow exception to this general policy. "While a cross appeal is

necessary to obtain a decision more favorable than that rendered by the lower tribunal, it is not necessary to urge an alternative ground for affirmance, even if the trial court considered and rejected that alternative ground." *Douglas v. Burley*, 134 So. 3d 692, 697 n.6 (Miss. 2012). For this reason, the Court had previously allowed an appellee to argue a point despite the lack of a cross-appeal because she "won a favorable judgment in the chancery court, [and] her position on appeal was to have this Court affirm the judgment." *Dunn*, 853 So. 2d at 1152 (¶8) (noting that the Court had not previously "addressed the issue of when a party must file a cross-appeal"); *see also Miss. Real Est. Appraiser Licensing & Certification Bd. v. Schroeder*, 980 So. 2d 275, 288 (¶35) (Miss. Ct. App. 2007) (when a party was "merely asserting another ground for affirming the circuit court's ruling," we determined "there is no requirement for a cross-appeal on this issue, and [his] claim [was] not procedurally barred").

¶50.    As in *Dunn* and *Schroeder*, here Dr. Williams asks us to affirm the trial court's finding on alternative grounds to her argument that "[t]here was no substantial evidence in the record . . . to support Dr. Williams' dismissal for verbal harassment of a colleague." While the trial court found that Dr. Williams had received procedural due process, we perceive her arguments on appeal to simply "urge an alternative ground for affirmance," and will proceed to the merits of her argument despite her lack of a cross-appeal.

¶51.    As to this issue, Dr. Williams argues that there was a "failure of the School District to sufficiently apprise her in writing as to the reasons for her termination of employment, which she was only able to generally ascertain during the course of the administrative hearing on her termination." She protests that her dismissal letter only pointed out she "was being

terminated for 'neglect of duty[.]'"

¶52. In response, the board argues that State law only requires general notice of the charge. The statute sets out that "[f]or incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the superintendent of schools may dismiss or suspend any licensed employee in any school district." Miss. Code Ann. § 37-9-59. Yet "[b]efore being so dismissed or suspended any licensed employee shall be notified of the charges against him and he shall be advised that he is entitled to a public hearing upon said charges." Miss. Code Ann. § 37-9-59.

¶53. Here, Dr. Williams was informed:

> You are hereby notified that you are being dismissed from your position as the CTE Counselor for the Coahoma County School District [on] August 18, 2023. The termination is due to the following reasons:
>
> Neglect of Duty
>     1. Failure to present yourself in a professional manner while dealing with another staff member in violation of the Standard 1 of the Code of Ethics.

Dr. Williams responded by letter three days after. She did not protest that she did not understand the charge against her or that it was too vague. Instead, she only asserted that in accordance with State law "this memorandum is composed to form[ally] request a public hearing to publish rebuttal of the following slanderous allegation[]"–namely, that she had failed to conduct herself in a professional manner. As an "Addendum," at the bottom of the letter Dr. Williams claimed that she "experiences emotional distress from assignation [sic] of character." Three days after her response, the date of her hearing was set.

¶54. Before termination, State law requires notice of the charge or charges an educator

faces. Dr. Williams was told she faced dismissal for failure to follow Standard 1 of the Code of Ethics, and specifically for the "Failure to present [her]self in a professional manner while dealing with another staff member[.]"

¶55.   It is important to note that Standard 1 contains multiple subsections which define both what constitutes ethical conduct and what might constitute unethical conduct. As to ethical conduct, this includes standard 1.1(b), "[r]especting fellow educators and participating in the development of a professional teaching environment." There are five subsections specifically pertaining to unethical conduct. These "include[], but [are] not limited to" the standard 1.2(a), the "[h]arassment of colleagues," as well as 1.2(c), "[i]nappropriate language on school grounds or any school-related activity."

¶56.   By explaining that she had violated Section 1 in the context of "dealing with another staff member," the dismissal letter then implicitly alerted Dr. Williams that she failed to uphold standard 1.1(b) and to violations of 1.2(a) and 1.2(c). By indicating that her failures were in the context of her professionalism "with another staff member," the dismissal letter impliedly did *not* charge her with failures of the other five standards of ethical conduct, and impliedly did not allege misconduct as to the other three descriptions of unethical conduct, such as "[m]isuse or mismanagement of tests or test materials," "[p]hysical altercations," and "[f]ailure to provide appropriate supervision of students and reasonable disciplinary actions."

¶57.   While Dr. Williams characterizes the dismissal notice as lacking "essential facts," we find that it sufficiently placed her on notice of the charges against her in accord with the statute. Furthermore, from the context of her response to the dismissal letter, it appears Dr.

18

Williams understood the nature of the charges, as she claimed she wanted a public hearing "to publish my rebuttal" of what she claimed were "slanderous" allegations which constituted an "assignation [sic] of character." Dr. Williams also was afforded a hearing per statute and had capable counsel who conducted extensive cross-examination of the witnesses arrayed against her.

¶58.    Accordingly, we find the appellee's procedural due process rights were not violated by the dismissal letter.

## CONCLUSION

¶59.    For the reasons stated above, we reverse the chancery court's order and render a decision reinstating the Coahoma County School Board's termination of Dr. Williams. We find no error in the chancery court's decision that the appellee did not suffer a due process violation.

¶60.    **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**